JOSEPH A. WALSH II, State Bar No. 143694
joe.walsh@cwn-law.com
ELLEN E. McGLYNN, State Bar No. 270367
ellen.mcglynn@cwn-law.com
COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone: (562) 317-3300
Facsimile: (562) 317-3399

Attorneys for Plaintiffs Dordellas Finance
Corp. and MSC Mediterranean Shipping
Company S.A.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| In the Matter of the Complaint of DORDELLAS FINANCE CORP., Owner, and MSC MEDITERRANEAN SHIPPING COMPANY S.A., Owner *pro hac vice*, of the Motor Vessel MSC DANIT, and its engines, tackle, apparel, and appurtenances, for Exoneration from or Limitation of Liability,<br><br>Plaintiffs, | Case No.<br><br>**COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**<br><br>**[46 U.S.C. §§ 30501, et seq.; and Federal Rules of Civil Procedure, Supplemental Rule F]**<br><br>IN ADMIRALTY |

DORDELLAS FINANCE CORP. ("Dordellas"), as Owner, and MSC MEDITERRANEAN SHIPPING COMPANY S.A. ("MSC"), as Owner *pro hac vice*, (collectively "Plaintiffs") of the Motor Vessel MSC DANIT, a Panamanian flagged containership bearing International Maritime Organization ("IMO") number 9404649 ("MSC DANIT" or the "Vessel"), by and through their undersigned attorneys, Collier Walsh Nakazawa LLP, file this Complaint in an action for exoneration from, or in the alternative, limitation of liability, civil and maritime ("Complaint" or "Action"). This Action is filed within the Admiralty jurisdiction of this Court. There is no right to a jury.

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

## **INTRODUCTION**

This matter relates to the October 2, 2021 oil spill off the coast of Huntington Beach, California for which Amplify Energy Corp. ("Amplify") is, by law, the "Responsible Party" ("Amplify Spill"). Despite a very clear and simplified claims process set out by Congress in the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et. seq.,* expressly intended to avoid and minimize lawsuits by those damaged by oil spills, various parties nonetheless initiated unnecessary and untimely legal proceedings arising out of, or in connection with the Amplify Spill naming various defendants including the Plaintiffs.

In *Peter Moses Gutierrez, Jr., et al. v. Amplify Energy Corporation, et al*., Case No. 8:21-cv-01628-DOC-JDE[1], this Court consolidated as many as fourteen separate (and sometimes competing) lawsuits, each purporting to cover claims for an untold number of potential class members, against, among other parties, the Plaintiffs. (*Id*. at Dkt. 102).  In a Consolidated Class Action Complaint, the claimant representatives assert a strict liability cause of action against Amplify and its two wholly owned subsidiaries, Beta Operating Company, LLC d/b/a Beta Offshore ("Beta Offshore") and San Pedro Bay Pipeline Company ("SPBPC") (collectively, "Amplify Interests") under OPA and assert other non-OPA claims against the Amplify Interests, Plaintiffs, and one other group of shipping interests.

In that same case, the Amplify Interests filed a Third Party Verified Complaint (collectively, "Amplify Claimants") against, among others, the Plaintiffs ("Amplify Complaint"). There, Amplify Interests seek contribution under section 2709 of OPA for removal costs and damages, and seek to recover for their own alleged non-OPA damages related to the loss of oil, damage to a subsea pipeline, ("Pipeline" or "Pipeline P00547"), and loss of use of the Pipeline. (*Id*. at Dkt. 123).

As they relate to Plaintiffs, the existing known claims and proceedings

---

[1] *See*, Notice of Related Case, filed concurrently herewith.

essentially allege that on January 25, 2021, some eight (8) months and one (1) week before the Amplify Spill, the MSC DANIT's anchor dragged or struck the 41 year old Pipeline, displacing and damaging it, but *only to such a limited extent* that Pipeline P00547 continued to be used, uninspected and untested, until October 1, 2021 when it suddenly ruptured and leaked oil. Yet, after nearly six months of investigations by various government agencies and the Amplify Interests, the proponents of such claims provide no evidence that the MSC DANIT came into contact with Pipeline P00547, let alone damaged it. Even if the proponents can establish that the MSC DANIT's anchor made physical contact with the offending Pipeline eight months prior to the spill, they provide no evidence to establish proximate cause.

Plaintiffs deny that their Vessel struck *or in any way* made contact with the offending Pipeline, or that they knew or had reason to know that their Vessel made such contact. Thus, by this Action, Plaintiffs are exercising their statutory rights, and those under the General Maritime Law, to first seek adjudication exonerating them from liability. Alternatively, if they are not so exonerated, Plaintiffs seek to limit their liability to the value of their Vessel and its pending freight at the end of the voyage.

This Admiralty proceeding is straightforward and through its concursus will serve to streamline existing claims and proceedings, call forward yet to be asserted claims, and advance efforts to have unserved parties appear and make claims. In that respect, this Admiralty proceeding is a means to efficiently manage the litigation so as to minimize delay and duplication of effort.

## **PROTECTIVE ADMIRALTY ACTION**

The practice of permitting a shipowner to seek exoneration and limit its liability traces back to the origins of commercial merchant shipping and continues to exist in varying forms throughout most of the world. It encourages maritime commerce and protects merchant shipowners from circumstances beyond their control. This Action upon which the Plaintiffs are entitled to seek exoneration from or limitation of liability, is based on the Act of March 3, 1851 (sometimes referred to as the

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

"Limitation of Liability Act of 1851"), 46 U.S.C. §§ 30501, *et. seq*. A longstanding tenant of U.S. admiralty law, Congress has determined that limitation is necessary to maintain America's competitive position with other shipping interests around the world by protecting maritime commerce, the shipowner and the greater shipping community at large from unreasonable, one-sided apportionment of costs. *See* Buglass, *Limitation of Liability from Marine Insurance Viewpoint*, 53 Tul.L.Rev. 1367 (1979); *Lewis v. Lewis & Clark Marine, Inc.* (2001) 531 U.S. 438, 446-447; *In re Bell* (W.D.Wash. Jan. 13, 2014, No. C12-1126JLR) 2014 U.S.Dist.LEXIS 4077, at \*5.; *In re Sarasota Youth Sailing Program, Inc.* (M.D.Fla. Aug. 5, 2021, No. 8:21-cv-150-CEH-CPT) 2021 U.S.Dist. LEXIS 146678, at \*4-5; *see also* 3 Benedict on Admiralty § 7 (2021); Admiralty Law Institute Symposium: The Uniqueness Of Admiralty And Maritime Law, 79 Tul. L. Rev. 1127, 1144 (2005). Thus, under the statute, Plaintiffs file this protective admiralty Action for exoneration from or limitation of liability.

This Action applies to all non-OPA claims[2] and proceedings asserted against the Plaintiffs including (1) the entirety of the claims asserted in the Consolidated Class Action Complaint, (2) the Second, Third and Fourth causes of action asserted in the Amplify Complaint, and (3) all other claims that might be asserted or filed in the future against the Plaintiffs.

To initiate an action for exoneration or limitation, Plaintiffs, as shipowners, first file a Complaint setting forth the facts on the basis of which the right to be exonerated or limit liability is asserted (*see*, Part IV. *infra*), and all facts necessary to enable the Court to determine exoneration or the amount to which the owner's liability shall be limited. Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims, Rule F (the "Supplemental Rules").[3]  These facts are expressly

---

[2] This Action does not pertain to the discreet contribution claim brought by the Amplify Interests against the Plaintiffs under OPA, 33 U.S.C. § 2709 in the First Cause of Action in the Amplify Complaint. 33 U.S.C. § 2718.

[3] A summarized description of the process and procedure related to this Action is provided to give

asserted below in this pleading (*see*, Part III. *infra*). Filed concurrently with this Complaint, Plaintiffs post financial security in the form of a Letter of Undertaking. Security is provided in the amount of $91,862,084, assuring the availability of a limitation fund in an amount equal to the value of the Vessel and then-pending freight.

Plaintiffs are further entitled to an immediate stay from all claims and proceedings against them relating to, or arising out of, the matter in question. 46 U.S.C. § 30511(c). Plaintiffs therefore request an immediate stay from all non-OPA claims and proceedings against them which are related to or arise from the Amplify Spill, specifically including those claims and proceedings currently pending before this Court, until such time that all the merits of the Action have been rightfully adjudicated.

Plaintiffs also request that this Court issue a Notice to all persons asserting claims for which this Complaint seeks exoneration and/or limitation, admonishing them to file their respective claims (and answer, if any) with the Court Clerk as set forth in Supplemental Rule F(5), and to serve a copy of their claim(s) on the attorneys for the Plaintiffs on or before a date to be determined by the Court but not less than 30 days from the date of the Notice ("Monition Period").

Within 30 days after the Monition Period closes or within such time as the Court may thereafter allow, Plaintiffs will provide each claimant or their attorney, a list setting forth (a) the name of each claimant, (b) the name and address of the claimant's attorney (if known to have one), (c) the nature of the claim, i.e., property loss, property damage, death, personal injury, etc., and (d) the amount alleged thereof.

Should a claimant contest the Plaintiffs' right to exoneration from or limitation of liability under the Limitation of Liability Act of 1851, the claimant shall first proceed to present proof for their challenges as is normal in civil trials. LAR F.2(83).

With the foregoing in mind, Plaintiffs allege as follows:

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

---

context to the mechanics and order of the proceeding.

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

# I.  **JURISDICTION AND  VENUE**

1. Plaintiffs' Complaint is an action for exoneration from or in the alternative, limitation of liability for civil and maritime claims which falls within admiralty or maritime jurisdiction of the Federal Court, Federal Rules of Civil Procedure 9(h) and 38(e), 28 U.S.C. § 1333, and Supplemental Rule F of the Supplement Rules of Admiralty or Maritime Claims (collectively "Admiralty Rules").

2. These claims are only cognizable in the admiralty or maritime jurisdiction of this Court.

3. Venue is proper within the United States District Court for Central District of California, Western Division, pursuant to Admiralty Rule F(9) because actions have already been filed against Plaintiffs[4] and the Vessel was, at relevant times, within this District.

4. On October 17, 2021, Plaintiffs first received written notice that a potential claim may exist. Plaintiffs file this Action less than six (6) months since the Plaintiffs received the first written notice of a claim.[5]

# II.  **PARTIES**

5. At all material times, Dordellas is and was a foreign corporation organized and existing under the laws of the Republic of Panama.

6. At all material times, MSC is and was a foreign corporation organized and existing under the laws of Switzerland.

7. The Vessel is a diesel powered cargo containership, documented under

---

[4] Although a standalone and separate action, this Complaint for exoneration from or limitation of liability is filed by the Plaintiffs preemptively in response to the Consolidated Class Action Complaint and Third Party Verified Complaint filed against them in the case entitled, *Peter Moses Gutierrez, Jr., et al. v. Amplify Energy Corporation, et al.,* Case No. 8:21-cv-01628-DOC-JDE (*See* Case No. 8:21-cv-01628-DOC-JDE at Dkts. 102 and 123, respectively). Accordingly, and in anticipation of the stay, no other responsive pleadings will be filed in response to those actions, until otherwise ordered by the Court.

[5] In a letter dated October 17, 2021, attorneys for the Amplify Interests wrote to one of the Plaintiffs stating they (Amplify Interests) suspected the Vessel's anchor dragged and struck Pipeline P00547, damaging and leading to its rupture.

the laws of the Republic of Panama, and bearing IMO number 9404649. At all material times, the Vessel was tight, staunch, strong, fully and properly manned, equipped and supplied, in all respects seaworthy, and fit for the service for which it was engaged.

8.    At all material times, the Vessel was under the technical management of an experienced and competent third-party, and Dordellas and MSC were not involved in the selection or provision of the Master, officers or crew for the Vessel.

9.    At all material times, Plaintiffs, are and have been the Owners and/or Owners *pro hac vice* of the Vessel within the meaning of the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501, *et seq.*

10.   At all material times, San Pedro Bay Pipeline Company, organized under the laws of California and headquartered in Long Beach, CA, owned and operated Pipeline P00547.

11.   At all material times, Beta Operating Company, LLC d/b/a Beta Offshore, organized under the laws of Delaware and headquartered in Houston, Texas, owned and operated two production and one processing platform and relies on Pipeline P00547 for product transportation.

III.   **FACTUAL BACKGROUND**

    *A.*   *PIPELINE P00547*

12.   Pipeline P00547 is a 16-inch, 17.3-mile-long common carrier pipeline first installed in 1980.

13.   Construction of the Pipeline was permitted by both U.S. Army Corps of Engineers representing federal interests, and the California Coastal Commission representing the State of California.

14.   During the permitting process, concerns of a potential anchor strike or risks of other interference by shipping were raised and seemingly addressed by requiring that the Pipeline be buried in those areas where ships might be expected to anchor.

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

15. Thus, Pipeline P00547 was permitted and constructed in such a way that it was to be buried 10-to-15 feet below the ocean floor where it passed from onshore and under the Long Beach breakwater crossing the inner anchorage area.

16. The remainder of the offshore section of the Pipeline which is outside the breakwater heading seaward to the platforms (approximately 10.9 miles), sits unburied on the ocean floor.

17. A concrete weight coating consisting of a 1-inch thickness of 190 lb/cu ft concrete is installed on the unburied section of the 16" steel pipe.

18. Since becoming operational, SPBPC has always owned Pipeline P00547.

19. SPBPC itself, however, has been bought and sold as many as 5 times since 1998, and was acquired by Amplify in 2017.

20. Nonetheless, SPBPC has always had full access to all records pertaining to Pipeline P00547.

21. On information and belief, SPBPC was also on notice of the foreseeability of an actual anchor strike.

22. On information and belief, on at least one occasion in 1992 the Pipeline was struck and possibly dragged by a ship's anchor.

23. On information and belief, as early as 2010, Amplify Interests were made aware that various sections of the Pipeline were not located within the coordinates originally permitted by the Army Corps of Engineers or as depicted on navigational charts.

24. On information and belief, since at least 2010, Amplify Interests either failed to understand the Pipeline's true location, or even worse, failed to responsibly advise federal and local authorities that in at least one location, Pipeline P00547 had moved outside of its understood location by as much as 150 feet.

### B. _HUNTINGTON BEACH OIL SPILL_

25. Amplify Interests first reported the oil spill offshore of Huntington Beach, California on or about 9:07 a.m., October 2, 2021. (previously referred to

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

herein as the "Amplify Spill").

26.     The United States Coast Guard, along with other federal and California government investigators, in consultation with the Amplify Interests determined that the source of the Amplify Spill was a ruptured subsea pipeline, previously identified as Pipeline P00547, owned and operated by SPBPC.

27.     The Pipeline discharged an estimated 25,000 gallons of oil over the course of fourteen (14) hours into the waters of the United States, and purportedly created a clean-up response zone of nearly thirteen (13) square miles.

28.      On the basis of information and belief, at approximately 4:10 p.m. on October 1, 2021, a low pressure alarm sounded signifying a possible leak in Pipeline P00547 indicated on Platform Elly, a facility owned and operated by Beta Offshore. The Platform's automated safety system shut down the pumping operation.

29.     On the basis of information and belief, Beta Offshore operators and their supervisors did not fully appreciate the significance and potential impact of the initial 4:10 p.m. alarm. Given their apparent lack of training, they simply restarted their pumping operations without any effective investigation or other mitigation.

30.     On the basis of information and belief, over the next several hours, Beta Offshore personnel ignored at least 4 other subsequent leak detection alarms and automated forced shutdowns. Like the first alarm at 4:10 p.m., Amplify Interests made no appreciable effort to inspect the surface waters over or near Pipeline P00547. Rather, after each and every subsequent alarm and shutdown, Beta Offshore personnel cleared the alarms, thereby resetting or bypassing safety features, and restarted pumping operations.

31.     On the basis of information and belief, the effect of restarting its pumps five times after each of the alarms and shutdowns, resulted in all, or significantly all of the oil to spill for over three hours.

32.     On the basis of information and belief, Beta Offshore personnel observed a sixth and then a seventh low pressure alarm at or about 10:01 and 11:15 p.m.,

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY

respectively. They again restarted and pumped oil for an additional three hours.

33.    On the basis of information and belief, in the predawn hours of October 2, 2021 and despite an eighth alarm at or about 5:28 a.m., Beta Offshore soldiered on, this time pumping for an additional half hour.

34.    On the basis of information and belief, Beta Offshore finally shut down its pumping operation at 6:01 a.m., approximately 14 hours after the first low pressure leak detection alarm sounded.

35.    On the basis of information and belief, Beta Offshore's operative oil spill response plan states, in the event of a detected leak, it is essential to shut down the shipping pumps and close the platform and onshore shut-in valves as quickly as possible to minimize the volume of oil released from the line.

36.    On the basis of information and belief, Amplify Interests did not immediately report the Amplify Spill, as required, to the National Response Center ("NRC") until 9:07 a.m. on October 2, 2021, over 16 hours after having received the first indication of a possible leak.

37.    On information and belief, Beta Offshore's oil spill response procedures emphasize immediate verbal notification to NRC.

38.    As a result of the aforesaid occurrences, claimant representatives and Amplify Interests claim to have sustained injuries and damages at a value presently unknown to the Plaintiffs, but expected to be in the tens to hundreds of millions of dollars.

C.    *VESSEL TRAFFIC SERVICES LOS ANGELES/LONG BEACH*

39.    A Vessel Traffic Service ("VTS") is the means by which the U.S. Coast Guard implements its regulatory framework to actively support the improvement of vessel safety and efficient movement through confined and busy waterways.

40.    Vessels and pilots within a VTS area of responsibility are required to utilize or comply with that service and must comply with VTS' instructions, directives or orders. 46 USC § 70001.

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

41.     A VTS servicing the ports of Los Angeles and Long Beach ("VTS LA/LB") is operated jointly by the U.S. Coast Guard and the Marine Exchange of Southern California in a unique public/private partnership. VTS LA/LB is the only VTS operated in the United States which is operated jointly with a partnership.

42.     VTS LA/LB exercises full U.S. Coast Guard "Captain-of-the-Port Authority" to enforce federal navigation and safety regulations within its area of responsibility including San Pedro Bay. Thus, vessels and pilots within VTS LA/LB's area of responsibility are required to use its service and comply with its instructions, directives, or orders.

43.     On information and belief, at all material times, upon arrival within its area of responsibility, VTS LA/LB established communications with ships via VHF radio and, depending on the availability of unoccupied anchorages, instructs ships to proceed to anchor at a pre-designated anchorage or to "drift" (loiter) offshore until there was room for it to anchor and berth to offload cargo.

44.     At all material times herein, VTS LA/LB exclusively chose and directed the assignment for all ships to the selected and predesignated anchorage positions.

45.     At all material times, predesignated anchorages outside of the Long Beach Breakwater included "F 1 to F 15" and "SF 1 to SF 3" as depicted on navigational charts including a chart approved and issued by the U.S. National Oceanographic and Atmospheric Administration ("NOAA"). *See*, NOAA Chart - 18749_Public.

46.     Upon information and belief, as a further means to alleviate historic port congestion and supply chain challenges, and to accommodate an unprecedented increase in the number of ships arriving in San Pedro Bay, additional anchorages outside the breakwater and to the Southwest of SF 1 to SF 3 anchorage area were also created and used by VTS LA/LB. One set of these additional anchorages were designated "SF 4 to SF 12" while another set, "H 1 to H 10", were established approximately 2 miles further to the South East, off the coast of Huntington Beach

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

("Huntington Beach Anchorage").

47.    On information and belief, each of the SF anchorages were spaced apart; each with a radius of approximately 600 yards from its center so that anchored ships could swing with wind and current without risk of striking one another.

48.    Upon information and belief, it is customary for VTS LA/LB to require ships assigned to a particular anchorage to check back with VTS LA/LB once at the assigned location before actually anchoring so that VTS LA/LB is able to verify that the ship is at the proper assigned anchorage.

49.    Only after the ship makes this secondary verification call will VTS LA/LB give final permission to anchor.

### D.    *MSC DANIT AND THE JANUARY 2021 WEATHER EVENT*

50.    The Vessel's Voyage upon which this action is based began on December 31, 2020 with its departure from Yantian, China and concluded on or about February 4, 2021 (the "Voyage End Date") when it finished discharging its cargo in the Port of Long Beach.

51.    The Vessel arrived in the VTS LA/LB area of responsibility on or about January 18, 2021 and was instructed by VTS LA/LB to proceed to anchor at SF 3.

52.    The Vessel did not propose, select or request to be anchored in SF 3. This determination was made exclusively by VTS LA/LB.

53.    The Vessel proceeded to SF 3, and once in position obtained final authority from VTS LA/LB to anchor there.

54.    Once the Vessel was properly and lawfully anchored at SF 3, as confirmed by VTS LA/LB, the Vessel set and maintained a proper anchor watch.

55.    On or about January 24, 2021 VTS began advising ships within 25 nautical miles of San Pedro Bay via radio broadcasts to expect high winds later that evening and into the early hours of the next day, January 25, 2021.

56.    On information and belief, on January 24, 2021 there were  more than 50 oceangoing vessels at anchor within the VTS LA/LB area of responsibility.

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

57.    On information and belief, despite its warnings of high winds, VTS LA/LB did not at any time order any ships to leave their anchorages in response to or in anticipation of its forecasted weather.

58.    On information and belief, on the evening of January 24, 2021, despite its own warnings and the expected high winds, VTS LA/LB continued to assign and instruct vessels to anchor within the San Pedro Bay.

59.    On or about January 25, 2021, while at anchor, the Vessel, along with the other vessels at anchor, began experiencing extremely high winds; estimated at over 40 knots and eventually generating seas of over seventeen (17) feet ("High Winds Event").

60.    MSC DANIT placed its engines on stand-by and made preparations to deploy its second anchor, in case it was needed, to mitigate the risk of dragging anchor.

61.     On information and belief, VTS LA/LB continuously monitored vessel positions and contacted ships if an alarm was triggered on VTS LA/LB's console that indicated when a ship might be losing ground and possibly dragging its anchor.

62.     On information and belief, between the hours of 3:00 a.m. and 6:00 a.m. (local) on January 25, 2021 there were a significant number of ships that were moving off their assigned anchorages and most likely dragging anchor.

63.    As the intensity of the High Winds Event increased, VTS LA/LB began instructing various ships at anchor to place their engines on standby and be ready to deploy a second anchor if needed to help hold position.

64.     On information and belief, at no time on January 25, 2021, did VTS LA/LB direct a ship suspected of dragging its anchor to heave anchor and put to sea.

65.     On information and belief, at no time on January 25, 2021 did VTS LA/LB instruct any ship to drop a second anchor as a means to better hold its ground.

66.     On information and belief, at approximately 4:30 a.m. on January 25, 2021, two oceangoing vessels which had been anchored by VTS LA/LB in the

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

Huntington Beach Anchorage collided.

67.     Due to the density of the 50 plus vessels at anchor, the continued deterioration of weather, the number of ships that were beginning to drag anchor, and the newly reported collision, the MSC DANIT's Master made the decision to heave anchor and relocate out to sea. MSC DANIT advised VTS LA/LB of its intentions and obtained its authority to heave anchor.

68.     The MSC DANIT found, however, that 3 other large ships which had been anchored close by, impeded and constrained the Vessel's ability to safely maneuver such that it was unable to immediately heave in its anchor and depart as planned. The Vessel was forced to take evasive action by letting out more chain so as to avoid contact with at least one of these other vessels.

69.     The Vessel safely extricated itself from the SF 3 anchorage, advised VTS LA/LB when it was underway, followed VTS LA/LB's additional instructions for a safe route to depart the anchorage and San Pedro Bay, and made its way to sea to await a berth assignment to discharge its containerized cargo.

70.     On information and belief, at least 24 other vessels also heaved anchor and put to sea on January 25, 2021 in furtherance of storm avoidance.

71.     While at its assigned anchorage on January 18, 2021, and even through its departure on January 25, 2021, neither the Master, officers nor crew of the Vessel were aware of, nor had any reason to believe or suspect that the Vessel came into contact with, or in any way damaged Pipeline P00547 including while taking evasive action during its efforts to heave anchor and relocate out to sea. More importantly, Plaintiffs were never made aware, nor were given any reason to be aware of any facts or circumstances, that actions and/or movements taken by the Vessel to raise its anchor,  would give rise to the possibility that any damage was caused to a third-party.

/ / /

/ / /

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

## IV.   DEMAND FOR EXONERATION FROM OR IN THE ALTERNATIVE, LIMITATION OF LIABILITY

### A.   *FACTS AND BASIS GIVING RISE TO EXONERATION*

72.   Paragraphs 1 through 71 above are incorporated by reference as though fully stated herein.

73.   Under the Limitation of Liability Act of 1851, a vessel owner is entitled to exoneration if the owner, the vessel, and the crew are shown to be free of fault. *Hartley v. St. Paul Fire & Marine Ins. Co.* (6th Cir. 2004) 118 F.Appx. 914, 918.

74.   The applicable standard of care under maritime law stems from traditional concepts of prudent seamanship, reasonable care, observance of statutory and administrative rules, and recognized customs and uses.

75.   At all material times, the Vessel was in all respects seaworthy, and the Owners, Master and crew acted with due care, free of any negligence or fault.

76.   While waiting to enter port, the primary duty of a cargo vessel is to follow the lawful orders and directions of VTS.

77.   In the instant case, the Vessel was on a voyage to deliver cargo to the Port of Long Beach, California and arrived within VTS LA/LB's area of responsibility on January 18, 2021. Due to unprecedented port congestion, VTS LA/LB instructed the Vessel to anchor in federal waters of the United States, and more specifically at the SF 3 anchorage within San Pedro Bay.

78.   The Vessel scrupulously followed all mandates and orders of VTS LA/LB and was not at any time in violation of any statutory or administrative rule.

79.   In the instant case there is no evidence of a breach of any duty by the Vessel.

80.   There is no evidence that any action by the Plaintiffs played any causal role in the Amplify Spill.

81.   There is no evidence that any action by the Vessel played any causal role in the Amplify Spill.

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

82.     There is no evidence that the MSC DANIT's anchor came into contact much less "hooked onto" Pipeline P00547 on January 25, 2021.

83.     Claimant representatives and Amplify Claimants acknowledge that their claims against the Vessel and Plaintiffs lack evidence of physical contact; each of their respective claims are purely conjectural based only on "information and belief."

84.     Even if the MSC DANIT's anchor came into contact with Pipeline P00547 on  January 25, 2021, which is denied, claimant representatives and Amplify Claimants do not and cannot demonstrate that such contact was the proximate cause of the leak found on Pipeline P00547 which is the source of the oil pollution over eight (8) months later. This time discrepancy undermines and negates any possibility that contact between the Vessel's anchor and the Pipeline played any causal role in the Amplify Spill and ignores other possibilities including other heavy weather or high wind events in which other vessels may have dragged or dropped anchor as well as the effects of subsurface currents and seismic activity.

85.     Moreover, even if the MSC DANIT's anchor came into contact with and damaged Pipeline P00547, the MSC DANIT's evasive actions were performed in the course of good seamanship and prudent conduct in order to avoid collision with other ships, avoid prejudice to the safe navigation of those ships, and to keep itself, its cargo, and its crew safe, and doing so was reasonable under the circumstances.

86.     MSC DANIT owed no duty to advise Amplify Interests that it sailed  one hundred feet above the supposed location of its Pipeline as this was plainly known to and acknowledged by VTS LA/LB.

87.     Thus, the Plaintiffs are free of fault and entitled to exoneration from liability.

88.     Even if the Plaintiffs were not free of fault, they are entitled to exoneration because the Amplify Spill was proximately caused by the negligence, in whole or in part, superseding and/or intervening, or in some combination thereof, of SPBPC, Beta Offshore, and/or other third parties for which the Plaintiffs are not

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY

1    liable.

2        89.    Moreover, a reasonably prudent pipeline owner, especially one with: (1)

3    notice of a prior anchor strike, (2) information that its Pipeline was not entirely in the

4    location as charted, (3) knowledge of a record number of ships densely anchored close

5    by, and (4) having experienced a significant weather event on January 25, 2021 (and

6    on other occasions), would have inspected, maintained, repaired and tested its

7    Pipeline more frequently and with closer scrutiny than was conducted by SPBPC.

8        90.    Even assuming its Pipeline was displaced and damaged on January 25,

9    2021, had SPBPC acted as a reasonably prudent pipeline owner rather than sitting

10   back and waiting to complete bare minimum inspections and testing, it would have

11   discovered that its Pipeline was somehow displaced and/or damaged well before it

12   revealed itself in October 2021.

13       91.    Similarly, Beta Offshore failed to act as a reasonably prudent platform

14   operator. Its operators failed to timely shut down pumping operations and investigate

15   the cause of no less than 8 low pressure alarms and automated leak detection features

16   over the course of a 14-hour period. The alarms alerted them to the spill, and

17   reasonably prudent operators would have stopped pumping oil into the Pipeline

18   thereby substantially minimizing any damage. Even after the Amplify Spill was

19   discovered, Beta Offshore's supervisors and the other Amplify Interests inexplicably

20   delayed reporting it to NRC for nearly three hours.

21       92.    Accordingly, because the actions and/or omissions of the Plaintiffs, if

22   any, are not the proximate cause of the Amplify Spill, the Plaintiffs are still entitled

23   and hereby demand full exoneration.

24       B.    *FACTS AND BASIS GIVING RISE TO LIMITATION*

25       93.    Paragraphs 1 through 92 above are incorporated by reference as though

26   fully stated herein.

27       94.    A claimant against the Vessel in the instant case must demonstrate (1) a

28   duty owed; (2) breach of such duty; (3) injury; and (4) a causal connection (proximate

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY

cause) between the breach and the injury.

95.    On or about January 28, 2022, the claimant representatives asserted claims in filing their Consolidated Class Action Complaint naming, among others, the Plaintiffs as defendants.

96.    The Consolidated Class Action Complaint asserts tort based claims against the Plaintiffs.

97.    The Consolidated Class Action Complaint seeks an unspecified amount of recovery from the Plaintiffs, though it is believed the amount sought may be in the hundreds of millions of dollars.

98.    On or about February 28, 2022, Amplify Claimants filed the Amplify Complaint naming, among others, the Plaintiffs and the Vessel as parties liable for the Amplify Spill.

99.    The Amplify Complaint seeks contribution for removal costs and damages under OPA (which, again, is not the subject of this Action), but also asserts non-OPA claims for damages associated with the loss of product, loss of use and damage to the SPBPC Pipeline.

100.   The Amplify Complaint does not provide a specified sum of its alleged non-OPA damages sought against Plaintiffs and the Vessel, though it is believed the amount sought may also potentially be in the hundreds of millions of dollars.

101.   While not in any manner admitting liability for any injuries or damages which any claimant or representative might allege they have suffered, and hereby expressing their desire to contest liability, Plaintiffs desire first to be completely exonerated from any and all such claims, and, if not so exonerated, in the alternative, to limit their liability, if any, for any and all said claims, to all claimants, to a maximum of liability equivalent to Plaintiffs' interest in the Vessel and pending freight, immediately following the subject incident on January 25, 2021 as alleged.

102.   Plaintiffs hereby claim the benefits of exoneration from or limitation of liability provided for in the Limitation of Liability Act of 1851, 46 U.S.C. §§ 30501,

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY

*et seq*., as amended and supplemented by the rules governing admiralty proceedings in this Court. Plaintiffs also claim the benefit of any other act and/or statute of the United States for which Plaintiffs may be entitled.

103.   In furtherance of limitation, Plaintiffs assert that the voyage on which the said alleged allision occurred and upon which parties initiated claims, demands and proceedings sought to be limited, began in Yantian, China on December 31, 2020 upon the Vessel's departure, and was terminated in Long Beach, California on or about February 4, 2021 upon arrival and conclusion of cargo discharge.

104.   As evidenced by the attached Declaration of Ellen McGlynn Regarding Vessel Value, the value of the Vessel on the Voyage End Date was $79,000,000. Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Ellen McGlynn Regarding Vessel Value.

105.   As evidenced by the attached Declaration of Christine Kientz Regarding Then-Pending Freight Value, the value of the pending freight on the Voyage End Date was $12,862,084.   Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Christine Kientz Regarding Then-Pending Freight Value.

106.   Plaintiffs believe and, therefore, allege that the value of the Vessel and its interest in the Vessel on the Voyage End Date was $79,000,000 and its interest in the pending freight as of the Voyage End Date was $12,862,084 for a total interest in the Vessel and pending freight at the amount of $91,862,084.

107.   Plaintiffs are informed and believe that the amount of estimated damages alleged against them and the Vessel is in the hundreds of millions of dollars and will exceed the value of Plaintiffs' interests in the Vessel and then pending freight at the Voyage End Date.

108.   Plaintiffs file contemporaneously herewith *Ad Interim* Stipulations of Value, in the form of a Letter of Undertaking issued by The United Kingdom Mutual Steam Ship Assurance Association Limited, for their interest in the Vessel plus the freight pending at the Voyage End Date, with interest at the legal rate of six percent

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

(6%) per annum, plus security for costs in the amount of $1,000, as required by LAR 83-F.1, or whichever amount may later be ordered by this Court.

109.   Upon information and belief, there are no actions or proceedings pending in contract arising from the Amplify Spill or the High Winds Event of January 25, 2021.

110.   Plaintiffs are informed and believe that no vessel arrest or attachment has been filed against the Vessel.

111.   Amplify Interests and one other shipping group asserted maritime liens based in tort against the Vessel for which they have accepted security in the amount of $97.5 million which by operation of law and terms would be subsumed and/or extinguished in this Action.

112.   Plaintiffs have a good faith basis and grounds to believe that in addition to the claims asserted in the Consolidated Class Action Complaint and Amplify Complaint, other claims will be made and that suits or actions will be commenced against them by persons or entities claiming to have sustained damages as a result of the Amplify Spill and the January 25, 2021 High Winds Event in amounts, when taken in the aggregate, exceed the total sum of the value of the Vessel and then-pending freight which without the protection of appropriate limitation law, the Plaintiffs  may be required to pay.

113.   The Vessel has not been damaged, lost or abandoned. The incidents and events alleged in the Consolidated Class Action Complaint and the Amplify Complaint, and any consequent injuries or damages resulting therefrom, were done, occasioned and incurred without any unseaworthiness of the Vessel.

114.   At all material times, due diligence was exercised to make the MSC DANIT in all respects seaworthy and properly manned, equipped and supplied.

115.   The incidents and events alleged in the Consolidated Class Action Complaint and the Amplify Complaint, and any consequent injuries or damages resulting therefrom, were done, occasioned and incurred without the privity or

knowledge of Plaintiffs or anyone for whom they may be responsible, at or prior to commencement of the above-described Voyage.

116.   The aforementioned damages were not caused or contributed to by any fault or neglect on the part of the Plaintiffs, and any consequent injuries or damages, resulting therefrom, were solely and proximately caused by the fault and/or neglect of others, including, but not limited to, the Amplify Interests and any and all claimant(s) who may have failed to avoid and/or mitigate their damages.

117.   Plaintiffs allege that they have valid, absolute and complete defenses to any and all alleged liability arising out of the above-described incident, on the facts and under maritime and admiralty law.

118.   Plaintiffs reserve their right pursuant to Federal Rules of Civil Procedure, Rule 15 to amend and supplement its Complaint as the Court and justice so requires.

## V.   **PRAYER**

WHEREFORE, the Plaintiffs pray:

a)   That the Court enter an order approving the aforementioned *Ad Interim* Stipulations of Value deposited with the Court by Plaintiffs as security for the amount or value of their interests in the Vessel and then-pending freight;

b)   That the Court, upon issuance of a monition, enter an order restraining the prosecution of any and all suits against Plaintiffs and/or the Vessel, which may have been already commenced by any person or entity to recover damages as a result of the Amplify Spill, and for which this Complaint seeks exoneration from or limitation of liability, and restraining the commencement and prosecution of any additional or unknown lawsuits, whether new or old, or any legal proceeding whatsoever, against Plaintiffs and/or the Vessel, with respect to any claims arising from the Amplify Spill, and for which this Complaint seeks exoneration from or limitation of liability;

c)   That the Court enter an order directing the issuance of a formal notice in the

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

form of a monition to all persons asserting claims against Plaintiffs and/or the Vessel, with respect to the Amplify Spill and the High Winds Event, and for which this Complaint seeks exoneration from or limitation of liability, admonishing them to file their respective claims with the Clerk of this Court, to serve a copy thereof on the attorneys for Plaintiffs, and to appear and answer the allegations of this Complaint, on or before a date to be fixed by the Court in the order;

d) That the Court enter an order directing the execution of the monition and publication thereof in such newspaper as the Court may direct, once a week for four (4) successive weeks prior to the date fixed by the Court for the filing of such claims, all as provided for in the law and by Rule F(4) of the Federal Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims;

e) That the Court permit Plaintiffs to contest their liability, if any, for all injuries and/or damages arising out of the aforesaid incident, and for which this Complaint seeks exoneration from or limitation of liability and this Court, in this proceeding, adjudge that Plaintiffs and the Vessel, are to be completely exonerated from liability arising out of the aforesaid incident, and for which this Complaint seeks exoneration from or limitation of liability and that no liability exists on the part of Plaintiffs and the Vessel for any injuries or damages resulting from the aforesaid incident, and for which this Complaint seeks exoneration from or limitation of liability;

f) In the event it is found by this Court that liability exists on the part of the Plaintiffs or the Vessel, by reason of the injuries and damages to any claimant, then the Court, in this proceeding, adjudge that such liability shall in no case exceed the amount of the value of Plaintiffs' interest in the Vessel and pending freight on the Voyage End Date; and

g) That Plaintiffs receive such other and further relief as the Court may deem

1      just and proper under the circumstances.

2

3   Dated:  March 31, 2022            COLLIER WALSH NAKAZAWA LLP

4

5                       By:       /s/ Joseph A. Walsh II

6                          Joseph A. Walsh II

7                          Ellen E. McGlynn
                         Attorneys for Plaintiffs Dordellas Finance

8                          Corp. and MSC Mediterranean Shipping
                         Company S.A.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COLLIER WALSH NAKAZAWA LLP
One World Trade Center, Suite 2370
Long Beach, California 90831
Telephone (562) 317-3300

COMPLAINT IN ADMIRALTY FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY