Kevin J. Orsini (*Pro Hac Vice*)
Omid H. Nasab (*Pro Hac Vice*)
Damaris Hernández (*Pro Hac Vice*)
Michael P. Addis (*Pro Hac Vice*)
korsini@cravath.com
onasab@cravath.com
dhernandez@cravath.com
maddis@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

Albert E. Peacock III, CASB No. 134094
Glen R. Piper, CASB No. 204023
David A. Tong, CASB No. 238971
Tara Voss, CASB No. 261967
Margaret Stando, CASB No. 343038
apeacock@peacockpiper.com
gpiper@peacockpiper.com
dtong@peacockpiper.com
tvoss@peacockpiper.com
mstando@peacockpiper.com
**PEACOCK PIPER TONG & VOSS LLP**
100 W. Broadway, Suite 610
Long Beach, CA 90802
Telephone: (562) 320-8880
Facsimile: (562) 735-3950

*Attorneys for Plaintiff Capetanissa Maritime Corporation*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| In the Matter of the Complaint of DORDELLAS FINANCE CORP., owner, and MSC MEDITERRANEAN SHIPPING COMPANY S.A., Owner *pro hac vice*, of the Motor Vessel MSC DANIT, and its engines, tackle, apparel, and appurtenances<br><br>and<br><br>CAPETANISSA MARITIME CORPORATION, Owner of the Motor Vessel BEIJING, and its engines, tackle, apparel, and appurtenances,<br><br>*Plaintiffs*. | **Case No. 2:22-cv-02153-DOC-JDE**<br><br>**CAPETANISSA MARITIME CORPORATION'S MOTION FOR CLARIFICATION AS TO THE COURT'S ORDER REGARDING THE SCOPE OF THE LIMITATION ACT TRIAL**<br><br>Judge: Hon. David O. Carter<br>Hearing Date: March 27, 2023<br>Time: 8:30 A.M.<br>Courtroom: 10A |

# NOTICE OF MOTION AND MOTION

## TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE** that Plaintiff Capetanissa Maritime Corporation ("Capetanissa") moves for clarification of the Court's February 10, 2023 Order Clarifying Scope of Limitation Act Trial (ECF No. 235).

The Motion is scheduled to be heard on March 27, 2023, at 8:30 a.m. in the courtroom of the Honorable David O. Carter, in the United States District Court for the Central District of California, Southern Division, Santa Ana, California.

The Motion is based on the attached Memorandum of Points and Authorities, exhibits, and other matters as may be presented in a reply memorandum and/or at the hearing.

The Motion is made following the conference of counsel on February 17 and 21, 2023 pursuant to Local Rule 7-3.

Dated: February 24, 2023      /s/ *Kevin J. Orsini*
                                                KEVIN J. ORSINI (*Pro Hac Vice*)
                                                **CRAVATH, SWAINE & MOORE LLP**
                                                *Attorneys for Plaintiff Capetanissa Maritime Corporation*

i

**CAPETANISSA'S NOTICE OF MOTION AND MOTION**

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 3

ARGUMENT ............................................................................................................ 5

I.     Amplify's Response to the First Leak Detection Alarm Is Within the Scope of the "Initial Oil Leak". .................................................................. 5

II.    Evidence Regarding Amplify's Negligence in Responding to All Alarms Should Be Heard at Phase I of the Limitation Trial. ............................ 10

**TABLE OF CONTENTS**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hunley v. Ace Maritime Corp.*,
    927 F.2d 493 (9th Cir. 1991) .............................................................................. 8

*Velazquez v. City of Long Beach*,
    793 F.3d 1010 (9th Cir. 2015) ........................................................................ 11

**Statutes & Rules**

Fed. R. Evid. 401 ..................................................................................................... 11

# PRELIMINARY STATEMENT

On February 10, 2023, the Court issued its Order Clarifying Scope of Limitation Act Trial ("Order"), which states: "The Court agrees [with Limitation Plaintiffs] that, with respect to the damages for the oil leak that Amplify and Class Action Plaintiffs seek to recover, Amplify's own negligent acts are relevant to the question of whether the vessels' negligent acts caused those damages." (ECF No. 235 at 8.) The Court therefore concluded that "Limitation Plaintiffs may introduce evidence establishing that the sole cause of either the pipeline damage or oil leak was Amplify's own extraordinary negligence." (*Id.* at 9.) Consistent with this, it ruled that it would assess in Phase I of the Limitation Trial "whether Amplify's own conduct was the sole proximate cause of . . . the initial oil leak." (*Id.* at 2.)

There is no dispute that Amplify Energy Corp., Beta Operating Company, LLC, and San Pedro Bay Pipeline Company's (together "Amplify") negligent conduct in the months and years leading up to the October 2021 oil spill is in the scope for Phase I of the Limitation Trial. Capetanissa also understands the Court's Order to mean that, at a minimum, Amplify's failure to shut down the Pipeline when it first started leaking and alarms started ringing is within the scope of that trial. On October 1–2, 2021, there were eight instances in which oil leaked from Amplify's Pipeline, as Amplify continued to restart its Pipeline despite oil leak detection alarms and despite failing to take basic steps to rule out a leak. (Plea Agreement for Defendant Amplify Energy Corp., 21-cr-00226, ECF. No. 42 ("Amplify Plea Agreement") at 26–29.) The first of those oil spills occurred between 4:05 p.m. and 5:10 p.m. on October 1, 2021. (*Id*. at 26.) Five minutes after that initial leak began, at 4:10 p.m., an alarm sounded to Amplify's control room operators that warned that there was a greater than 99% probability that the Pipeline was leaking oil into the Pacific Ocean. (*See* Kane Dep. Tr. 144:2–15.) For an hour, Amplify disregarded that alarm and kept the Pipeline running.

(Amplify Plea Agreement at 26.) If Amplify had heeded its leak detection system, procedures, industry standards, and common sense, and shut down the Pipeline at the first alarm, many if not all claims for the oil leak being asserted against Limitation Plaintiffs would have been *entirely* avoided. These include, for example, claims relating to the cancellation of the Pacific Airshow, claims related to closed fishing areas, and claims relating to oil that reached the shore. In other words, in addition to the proof that will be offered about how Amplify could have avoided any oil hitting the water, Capetanissa will also prove that Amplify's extraordinary negligence in responding to the first leak detection alarm was the *sole* proximate cause of the overwhelming majority, if not all, of the leak-related claims asserted against Limitation Plaintiffs.

In meet and confers between the parties this week and last, Amplify and its subrogated insurers took the position that the scope of the Order precludes any evidence whatsoever after the "first drop" of oil hit the water, and thus precludes evidence about Amplify's response to any of the leak alarms, including the first one. This concept, that the Court will preclude evidence as to Amplify's conduct, is an effort to re-argue positions already advanced and rejected. Specifically, it is at odds with the Court's holding that "Amplify's own negligent acts are relevant to the question of whether the vessels' negligent acts caused those damages" and explicitly permitting the introduction of evidence establishing that the sole cause of the "oil leak was Amplify's own extraordinary negligence." (Order at 8–9.) It also cannot be squared with the procedural posture; Amplify and its subrogated insurers effectively are claiming that the Court has somehow ruled that none of Amplify's conduct after the first drop of oil hit the water could constitute superseding negligence before the Court has been offered any evidence whatsoever about that conduct or the nature of the harms claimed by each of the

2
**CAPETANISSA'S MEMORANDUM OF LAW**

parties. Because Capetanissa disagrees with Amplify and its insurers, it respectfully seeks clarification from the Court on the scope of the Order.[1]

Capetanissa also requests that the Court address whether Limitation Plaintiffs will be allowed to present evidence of Amplify's response to the seven other spill alarms throughout the night in Phase I of the Limitation Trial. In addition to hearing evidence about Amplify's response to the initial leak, the Court should also decide whether Amplify was a superseding cause of the subsequent oil leaks on October 1 and 2, 2021. Given the wide variety of claims being asserted against Limitation Plaintiffs, it remains the case that if the Court finds that Amplify was extraordinarily negligent with respect to any of the subsequent alarms—and it was, as its guilty plea confirms—then there are large categories of claims that Limitation Plaintiffs will still be able to prove are entirely extinguished by Amplify's superseding negligence (in the event Limitation Plaintiffs are not both exonerated). There are also other reasons to permit evidence of Amplify's conduct with respect to the alarms after the first one. The relevant witnesses for alarms two through eight will already be called in Phase I to address Amplify's conduct before and during the initial oil leak. Moreover, Amplify's response to the subsequent leak detection alarms is independently and directly relevant to showing that its response to the initial oil leak between 4:05 p.m. and 5:10 p.m. was a result of Amplify's grossly negligent training, policies and procedures for responding to a leak alarm.

## BACKGROUND

On the morning of October 1, 2021, Platform Elly experienced an "upset" during which oil and water did not properly separate in the processing

---

[1] In the parties' meet and confers, the Dordellas Parties agreed with Capetanissa's reading of the Order and disagreed with the reading of Amplify and its insurers.

3
**CAPETANISSA'S MEMORANDUM OF LAW**

vessels on the platform. (Amplify Plea Agreement at 24.) As a result, Amplify's employees knowingly pumped a higher than usual concentration of water through the Pipeline. (*Id*.) During this process, Amplify's employees ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (*See* Ex. 1, Sanchez Dep. Tr. at 197:8–198:14.) Shortly thereafter, at 4:03 p.m., the Pipeline's pressure spiked ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Ex. 2, AMPLIFY-00156040.) Despite Amplify's procedures requiring employees to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. 3, AMPLIFY-00138486 at -8491), Amplify left its Pipeline running after this pressure spike on October 1, 2021 (Amplify Plea Agreement at 24–26). In fact, Amplify's control room operators made no note of the pressure spike, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Ex. 1, Sanchez Dep. Tr. 202:16–18.)

At 4:05 p.m., after this spike in pressure, the Pipeline ruptured and began leaking oil. (Amplify Plea Agreement at 24.) Shortly thereafter, at 4:10 p.m., Amplify's leak detection system issued its first leak alarm. (*Id*. at 26.) The initial oil leak lasted until 5:10 p.m., one hour later, because Amplify chose to disregard its leak detection alarm and procedures, despite that alarm indicating a greater than 99% chance of an oil leak. (*Id*.; Ex. 6, Kane Dep. Tr. 144:2–15.) Amplify's control room operators could not recall ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ during the one-hour period of the initial oil leak. (Ex. 4, Pritchard Dep. Tr. 141:24–142:6; Ex. 1, Sanchez Dep. Tr. 217:16–218:11.) Had Amplify shut down the Pipeline immediately in response to the first leak detection alarm, only a relatively small amount of oil would have spilled into the San Pedro Bay, compared to the 588 barrels that ultimately leaked from Amplify's Pipeline. (Amplify Plea Agreement at 29.)

After the initial oil leak, Amplify proceeded to restart and then shut off the Pipeline seven more times, causing an additional leak each time, as identified in Amplify's guilty plea and below. (*Id.* at 26–29.)

| Leak Event | Start Time | End Time |
|---|---|---|
| Initial Leak | 4:05 PM | 5:10 PM |
| Leak 2 | 5:40 PM | 5:53 PM |
| Leak 3 | 7:03 PM | 7:42 PM |
| Leak 4 | 8:29 PM | 8:43 PM |
| Leak 5 | 9:12 PM | 9:24 PM |
| Leak 6 | 9:44 PM | 10:33 PM |
| Leak 7 | 11:15 PM | 2:27 AM |
| Leak 8 | 5:11 AM | 6:04 AM |

Instead of taking seriously the alarms that sounded each time the Pipeline was restarted, Amplify's employees assumed each alarm was false, ignored numerous warnings that the Pipeline was in fact leaking oil, ███████████████████████████████████████████████████████. (*See e.g.*, *id.* at 25; Ex. 4, Pritchard Dep. Tr. 144:13–145:23.)

Capetanissa is prepared to present evidence to the Court that will establish that Amplify's conduct towards each alarm was both negligent and unforeseeable in a manner that breaks the chain of causation for any liability that may be attributable to Capetanissa for each of these leak events.

## ARGUMENT

### I. Amplify's Response to the First Leak Detection Alarm Is Within the Scope of the "Initial Oil Leak".

Last month, the parties filed briefs regarding the proposed scope of the Limitation Trial that is set to begin in April, and the Court held oral argument

5
**CAPETANISSA'S MEMORANDUM OF LAW**

on the issue on February 6, 2023. Capetanissa argued that the Limitation Trial should address "who is responsible for the discharge of 25,000 gallons of crude oil from the San Pedro Bay Pipeline" and whether Amplify's negligence amounted to a superseding cause. (Capetanissa Mem. re Scope of Limitation of Liability Act Proceedings, ECF No. 209 at 4.) Amplify, in contrast, argued that its conduct "has no bearing" on whether the DANIT and the BEIJING were negligent or unseaworthy on January 25, 2021, and should not be within the scope of the Limitation Trial. (Amplify Mem. In Response to Scope of Limitation Trial, ECF No. 225-1 at 8–10.)

The Court rejected the position that Amplify's conduct has no part in the upcoming trial. Instead, "[t]he Court agree[d] that, *with respect to the damages for the oil leak that Amplify and Class Action Plaintiffs seek to recover*, Amplify's own negligent acts are relevant to the question of whether the vessels' negligent acts caused those damages." (Order at 8 (emphasis added).) Specifically, the Court held that Limitation Plaintiffs may introduce evidence in Phase I of the Limitation Trial that "breaks the chain of proximate causation required to impose liability upon the vessel owners for the oil leak." (*Id*. at 9.) The Court also noted that there was not a single harm associated with the oil spill, but rather a "wide variety". (*Id*. at 7 (internal quotation marks omitted).)

In the Limitation Action, there are claims for hundreds of millions of dollars in damages tied to the oil leak, including from, among others, Amplify and Amplify's subrogated insurers for the cost of responding to the oil spill and for paying claims from fishermen and other affected individuals and businesses. (*See*, *e.g.*, Amplify's First Amended Claim in Limitation, ECF No. 168; Subrogated Insurers' Answer to Capetanissa's Complaint for Exoneration from and Limitation of Liability, ECF No. 70.) Damages discovery has been stayed until later phases of this action, but there is no doubt that if Amplify had appropriately responded to the

first alarm during the initial oil leak—and therefore limited the leak to a few barrels of oil, rather than the 588 barrels that ultimately spilled—there would be harms and claims that currently are at issue in the Limitation Trial that would have been *entirely avoided*.  As to such claims and harms, Amplify's extraordinary and unforeseeable negligence is the *sole* proximate cause.  Without it, such harms would not have happened, and such claims would not have arisen.  The question of whether Amplify's negligence in failing to shut down the Pipeline after the first leak alarm was the sole proximate cause of any claims that followed that first alarm is a question for Phase I of the Limitation Trial because, if Amplify's conduct was a superseding cause, it broke the chain of causation as to those claims under the standards set forth in the Order.

The identity of which claims would not have occurred if Amplify had shut off the Pipeline after the first alarm is a question for the damages phase, but, to provide an example of such a claim, Capetanissa understands that Amplify paid a significant claim or claims relating to the Pacific Airshow because the City of Huntington Beach canceled day three of the Airshow in 2021 due to the oil spill, citing specifically the "size of the spill" and the scope of the consequent impacts.[2]  Amplify and its insurers now seek to recover from Limitation Plaintiffs for the payments related to the Airshow's cancellation.  (*See*, *e.g.*, ECF No. 168 at 23; ECF No. 70 at 58.)  But, as Capetanissa will prove if we reach a damages phase, the Airshow would not have been canceled if Amplify shut the Pipeline down when the first alarm sounded.  It is *not* the case that Amplify was one of two proximate causes of this claim or that its actions increased the size of this claim to

---

[2] *See* Public Advisory, City of Huntington Beach, City of Huntington Beach Cancels Day Three of Pacific Airshow Due to Oil Spill (Oct. 3, 2021), https://huntingtonbeachca.gov/announcements/attachments/HB%20Oil%20Spill%20-%20Airshow%20Cancellation.pdf.

7
**CAPETANISSA'S MEMORANDUM OF LAW**

a higher amount than it otherwise would be. Instead, absent Amplify's extraordinary and unforeseeable negligence relating to the first alarm (which alerted Amplify to a greater than 99% probability of an oil leak), the chain of causation would be broken and the harm at issue—the cancellation of the Pacific Airshow—would have never occurred. Because damages discovery has been deferred, Capetanissa cannot catalog every such claim where Amplify's failure to respond to the first alarm is the sole proximate cause, but there would plainly be many such claims and harms, including most or all claims related to oil reaching shore and fishing closures.

*Hunley v. Ace Maritime Corp.* is instructive on this front. 927 F.2d 493 (9th Cir. 1991). There, the court held that the extraordinary negligence of one party in failing to appropriately respond to an incident it was partially negligent in causing cut off all liability for the other party responsible for the incident with respect to subsequent damages suffered by a third party arising out of the original incident. In *Hunley*, two vessels collided, sinking the first ship within minutes. *Id*. at 495. The second vessel abandoned the scene without assisting, and a third vessel undertook the rescue, which resulted in one of its crewpersons suffering an injury in the process. *Id*. Though the district court held that the two colliding vessels had both failed to maintain a proper lookout and thus were "equally responsible for the collision", the court rejected the second vessel's contribution claim for 50% of the settlement it paid out to the third vessel because it found the second vessel's "failure to render assistance to the [first vessel] to be a superseding cause of the damages suffered by the [third vessel]." *Id*. at 495–96. The Ninth Circuit affirmed and rejected the second vessel's argument that "because the chain of events that culminated in the injury to the [third vessel's] crew member began with the collision, the [first vessel] should bear their apportioned share of the loss". *Id*. at 497. Similarly, if the Court finds that Amplify was extraordinarily

8
**CAPETANISSA'S MEMORANDUM OF LAW**

1  negligent in responding to the first leak alarm, Amplify will be the sole proximate
2  cause of the oil spill damages that would not have occurred if Amplify had heeded
3  the alarm and stopped pumping oil.
4        Amplify would have the Court's Order not only be a determination as
5  to the scope of the Limitation Trial, but also an evidentiary ruling.  More
6  specifically, Amplify effectively is taking the position that the Court has already
7  ruled that *as a matter of fact* Amplify was not the sole proximate cause of *any* of
8  the claims or harms at issue in the Limitation Action once a single drop of oil
9  entered the water.  The Court's Order makes no such determination.  The Court has
10 not, at this stage, made any factual determinations about causation as to all of the
11 "wide variety of damages" at issue in the Limitation Action before the Court has
12 heard any evidence on what conduct proximately caused those claims and
13 harms. (Order at 7 (internal quotation marks omitted).)  Nor would Amplify's
14 reading make sense, as a leak of a single drop of oil would likely not have caused
15 *any* harm or claims, much less significant harms that the Order confirms are at
16 issue in the Limitation Trial, such as the cancellation of the Pacific Airshow, the
17 closing of certain fishing areas and the harms felt on shore.
18       Accordingly, Capetanissa respectfully requests that the Court clarify
19 that when it ruled that the Court will hear evidence on whether "Amplify's own
20 conduct was the sole proximate cause of . . . the initial oil leak", that included at
21 least Amplify's conduct during the first leak of oil from the Pipeline between 4:05
22 p.m. and 5:10 p.m. on October 1, 2021.  (*Id*. at 2.)  The Court's determination of
23 whether Amplify's conduct in response to the first alarm amounted to
24 extraordinary and unforeseeable negligence that breaks the chain of causation as to
25 claims at issue in the Limitation Action only can be made after the Court hears the
26 evidence at trial.
27
28

9

**CAPETANISSA'S MEMORANDUM OF LAW**

## II. Evidence Regarding Amplify's Negligence in Responding to All Alarms Should Be Heard at Phase I of the Limitation Trial.

In addition to seeking clarification that the Court will hear evidence on whether "Amplify's own conduct was the sole proximate cause of . . . the initial oil leak", Capetanissa also requests that the Court determine whether it will be allowed to present evidence of Amplify's negligence as to the ensuing oil leaks. (*Id.*) For the three reasons set forth below, Capetanissa believes that such evidence should be received by the Court.

*First,* for the same reasons that the Court needs to look at whether Amplify's conduct was extraordinarily negligent as to the initial oil leak, such that it cuts off Limitation Plaintiffs' liability, it should retain the ability to do so for the subsequent oil leaks as well. As discussed above, in this phase, prior to damages discovery, the Court is not in a position to rule on which claims (such as the cancellation of the Pacific Airshow) arose because of which spills. But it can, and should, draw the line at this trial as to if and when Amplify's conduct with regard to the oil spills reached a level where it was sufficiently negligent and unforeseeable to break the chain of causation, such that this issue does not need to be tried again. Capetanissa believes that this occurred before the oil spill or, at the least, during the initial oil spill. If the Court disagrees, it should hear a fully developed factual record to put itself in a position to rule on if and when Amplify's negligence crossed the line thereafter, as Amplify continued to disregard its own leak alarms without taking steps to rule out a leak. This would promote efficiency and is necessary to resolve Capetanissa's superseding cause defense.

*Second*, evidence of Amplify's response to alarms two through eight is independently probative of Amplify's response to the initial oil leak. Amplify's conduct during the subsequent oil leaks is directly relevant to showing that its response to the first alarm and the initial oil leak was a result of Amplify's grossly

1   negligent lack of appropriate training, policies and procedures.  "Evidence is
2   relevant if . . . it has any tendency to make a fact more or less probable than it
3   would be without the evidence." *Velazquez v. City of Long Beach*, 793 F.3d 1010,
4   1028 (9th Cir. 2015) (quoting Fed. R. Evid. 401).  During the initial oil leak,
5   Amplify's control room operators did not shut down the Pipeline for one full hour
6   after receiving a leak detection alarm that warned of a greater than 99% probability
7   of a leaking pipeline, and ▋
8   before they restarted the Pipeline, such as ▋
9   ▋
10  ▋
11  ▋
12  ▋. (*See, e.g.*, Ex. 4, Pritchard Dep.
13  Tr. 83:4–7, 149:1–151:24.)  Evidence that this conduct continued throughout the
14  night of October 1 and morning of October 2, 2021 proves, let alone makes it
15  "more probable", that Amplify's response to the initial oil leak was due to a
16  grossly negligent lack of training and procedural controls.  Fed. R. Evid. 401.  For
17  example, control room operator Gene Pritchard will testify to how he restarted the
18  Pipeline several times ▋
19  ▋. (Amplify Plea Agreement at 26–29; Ex. 4, Pritchard Dep. Tr.
20  163:3–15 ▋
21  ▋
22  ▋ (emphasis added).)  This testimony sheds light on
23  Amplify's grossly negligent failure to train its employees on how to interpret and
24  respond to leak alarms, and Amplify's systematic failure to comply with its own
25  policies and procedures (which require ▋ after a sign of a
26  leak).  (Ex. 5, AMPLIFY-00003646 at -3650.)
27
28

*Third*, the relevant witnesses for alarms two through eight will already be called in Phase I to address Amplify's conduct, both before and during the oil spill.  For example, Capetanissa intends to present evidence in Phase I that a pressure spike immediately preceding the Pipeline rupture likely caused that rupture and that Amplify's failure to detect or recognize the risks associated with that pressure spike was negligent.  (*See* Ex. 6, Kane Dep. Tr. 169:14–16 ("I think it's safe to say that pressure increase created enough stress on the pipeline to make it rupture.").)  The same witnesses who will be testifying regarding the mismanagement of the pressure spike before the oil spill—which is in the scope even under Amplify's reading of the Order—will be the witnesses who address the decision to keep pumping oil despite each of the eight leak alarms.  In other words, alarms two through eight will be addressed through the same witnesses and the same policies and procedures as the conduct that preceded the oil spill and the conduct during the initial oil leak.  As a result, there will be no significant efficiency gained by cutting off evidence of the later oil leak detection alarms.

**CONCLUSION**

For the reasons set forth above, the Court should clarify that it will allow Capetanissa to put on evidence during Phase I of the Limitation Trial establishing Amplify's extraordinary negligence in responding to the oil leak detection alarms.

Dated: February 24, 2023

CRAVATH, SWAINE & MOORE LLP

By: /s/ *Kevin Orsini*

Kevin J. Orsini (*Pro Hac Vice*)
Omid H. Nasab (*Pro Hac Vice*)
Damaris Hernández (*Pro Hac Vice*)
Michael P. Addis (*Pro Hac Vice*)
*korsini@cravath.com*
*onasab@cravath.com*
*dhernandez@cravath.com*
*maddis@cravath.com*

PEACOCK PIPER TONG + VOSS LLP
Albert E. Peacock III
Glen R. Piper
David A. Tong
Tara Voss
Margaret Stando
*apeacock@peacockpiper.com*
*gpiper@peacockpiper.com*
*dtong@peacockpiper.com*
*tvoss@peacockpiper.com*
*mstando@peacockpiper.com*

*Attorneys for Plaintiff Capetanissa Maritime Corporation*

13

**CAPETANISSA'S MEMORANDUM OF LAW**